and our first one today we're hearing by video. And I'll call it and we'll proceed. Case is Magnetsafety.org v. Consumer Product Safety Commission. The case number is 22-9578. Counsel for petitioner. Mr. Dolan, are you ready to proceed? Yes, your honor. Thank you very much. Good morning, may it please the court. Let me begin by just expressing all counsel's appreciation for the court's accommodation to allow us to present this argument via Zoom on a super emergency basis. With that, let me just go straight to the argument. Eight years ago in Zen Magnets, this court vacated the predecessor rule presently being challenged because CPSC failed to conduct a proper cost-benefit analysis. Specifically, the court held that CPSC failed to account for its own enforcement efforts and how that those enforcement efforts affected the trend in magnet ingestions. And that CPSC overcounted magnet injury, thus inflating their costs and undercounted their benefits. And going back to the drawing board and promulgating a new rule, the commission, although they tried to do better, ultimately committed the same fatal errors. Its cost-benefit analysis suffers from five major flaws and I have to go through all of them. First, counsel, counsel, can I just interrupt for one second? Ask the clerk to turn down the volume just a little bit. Yes. Thank you. Excuse me, Mr. Golan. Go ahead. Oh, okay. Thank you. First, the commission treats all magnet ingestions and even suspected ones as cost attributable to high-powered magnets. But that's just wrong. High-powered magnets are particularly dangerous, not merely because they're small. After all, there are lots of small things that kids play with. As the commission and the court itself and Zen Magnets recognize, the peculiar danger of these magnets is that when they're injected in multiples, they can get stuck to each other and potentially pinch tissues inside the body, causing necrosis or other problems. But when a single magnet, for example, is swallowed, the dangers are no different than if a child swallows a dime or a thumbtack or anything else. And yet the commission, despite recognizing that at least one-third of ingestions were of a single magnet, attributes all ingestion costs to the peculiar dangers posed by these small high-powered magnets. Well, Mr. Golan, I have a question about that argument, the single magnet versus multiple magnets. So doesn't the record show that physicians need to monitor all magnet ingestion incidents in children, even if it turns out that the child swallowed just one magnet, because the child could have swallowed more than one? So if single magnet ingestions contribute to the societal costs of these products, why was it unreasonable for the agency to count them in the rules benefits? Thanks, Judge Matheson. It's actually a great question and leads me directly to my second point that I was going to make. And the reason it's unreasonable is not because physicians don't need to monitor. Of course they need to monitor. In fact, parents oftentimes take their children, even a mere suspicion that they swallowed something, even if nothing was swallowed. But that has nothing to do with peculiar costs of these high-powered magnets. So these are merely societal costs of having small things around the house generally, like I said, thumbtacks, dimes, pennies, et cetera. And since, of course, the commission is not going to ban all small things, so the mere fact that physicians need to monitor things that were ingested shows us nothing as to whether these high-powered magnets are unreasonably dangerous. So in order to figure out whether these magnets are unreasonably dangerous, what a commission needed to have done is figure out what costs are associated with high-powered magnets versus what are the benefits associated with high-powered magnets, and then balance the two. Mr. Dolan, this is Judge Federico. I also had a question about that. There was an amicus brief filed by the American Academy of Pediatrics, and they support the rule. And in their brief, it was a bunch of medical organizations, and they called the magnet ingestion, quote, a pediatric health crisis. And so I understand in your argument that the commission did not disaggregate data between small items and magnets, but I did not see you reply, or in your reply, that you addressed this argument about, you know, the organization of physicians calling this a health crisis. So I wanted to give you an opportunity to do that. Sure. And again, so these questions are – so they track my arguments, so I very much appreciate them. One of the problems with CPSC's counting is that it failed to account for the fact that for reasons that I can't quite articulate, and I don't think commission can, I think more studies need it. It seems to be that since the prior rule was vacated, there has been an increase in number of small item ingestions, period, magnets for other items. And so I don't necessarily dispute AAP's position that there is a crisis of magnet ingestions, because there very well may be a crisis of ingestions of generally small items. And – but again, the rule then doesn't address that problem, or at least it doesn't take those trends that everything goes up into account. And again, that's the very problem that this court identified last go-around, saying that in order to come up with a rule, any rule, commission needs to take into account general societal trend. Last time, it was the trend that the number of ingestions went down following stepped-up enforcement efforts. The commission simply ignored. This time, it's the trend that overall, for whatever reason, children seem to be shoving more things into their mouth. Maybe it's because there's more homeschooling. Maybe it's because of, you know, there was – people stayed longer at home during COVID or whatever other reason. But that trend simply was not addressed in the commission's finding. MS. MCDOWELL. Could you go back, counsel – counsel – sorry, Judge Moritz here. MR. MORITZ. Sure. MS. MCDOWELL. Could you go back – could you go back to the single versus the double – or can you address what data it is that you think the commission could have relied on here? Commission explained its limited data, the NEISS data, and that it doesn't – you know, they did the best that they could with the data that they had. Do you – are you suggesting there's something more that they could have done? MR. MORITZ. Absolutely. I don't think they did the best that they could. I – you know, I acknowledge that they did better than they last go-around, but I don't think they did the best that they could. So, first, I think, as mentioned in our brief and in the commission's own record, they themselves recognized that at least one-third of these magnets are single-magnet ingestions, and yet proper discounting is not made. Second, I think as I was – in my answer to Judge Matheson, I mentioned that it is not at all unreasonable for parents to take their small kids to ER or to urgent care center and have an image, a mere suspicion that they swallowed something, even if they haven't. And as the commission itself acknowledges, half of these ingestions – and this also goes to Judge Federico's question – half of these – MS. MCDOWELL. Well, counsel, I don't think – I'm sorry. I don't think you're focusing on my question, which is I think we understand that point, but the problem that the commission has is the evidence that they have, the evidence that's available as to these emergency room visits, it's not that granular. It's much more general, and they can only – they can get so much out of it, but they can't necessarily identify whether it's a single- or double-magnet issue, even if they wanted to, unless there happens to be that information. And so they explain, which they're required to do when they have limited data, you know, how – what they relied on and how they relied on it and why it's limited. What more are you suggesting that the commission could have done here? So that's my question. MR. GOLDSTEIN. So I think, Judge Morris, if I can address it kind of in two ways. One, I think there is data that is somewhat more granular. After all, for example, when you do imaging studies, you can see what has been followed. MS. MCDOWELL. Could you slow down just a little? MR. GOLDSTEIN. Absolutely. MS. MCDOWELL. I'm sorry. MR. GOLDSTEIN. I'm sorry. MS. MCDOWELL. Could you slow down just a little? MR. GOLDSTEIN. Absolutely. So I think that there is – that data can be made more granular, because after all, the commission itself acknowledges that that's how they know that at least one-third of these are single-magnet ingestions. And the studies would show – the imaging studies would show what's inside the child. Number two, again, so the cost that commission takes into account, for example, the imaging costs, are actually somewhat irrelevant, because whether a child swallows one magnet, zero magnets, or 10 magnets, or whether it was a magnet at all, the parents would take the child to the ER just to get imaging. And so the only cost attributable to high-powered magnets as such are costs that involve dealing with ingestion of high-powered magnets specifically, as opposed to ingestions of dimes. So, for example, if the commission limited its counting, for example, to costs of surgeries, to costs of endoscopies, things that actually are attributable to the dangers posed specifically by high-powered magnets, that would make sense. But they lump together these costs that have nothing to do with high-powered magnets qua high-powered magnets. So I think both the data is available as being somewhat more granular, and they could have done a better job. But even if it weren't, I think counting mere imaging studies that would happen no matter whether the child swallowed or anything, is just too much counting on the cost side. Does that get to the question? Mr. Dolan, could I just approach a similar, maybe it's the same question, but in a slightly different way. The government argues that the figure for social cost here, 51.8 million, is a conservative number, and that it arguably could have been as high as 219.7 million. Why isn't the 51.8 million number conservative? It's not conservative because the inputs are too broad. So in order to figure out whether something is conservative or more permissive, I think we need to disaggregate relevant inputs, such as, for example, costs associated with surgery. Excuse me for interrupting, but didn't they exclude certain inputs? In other words, didn't they exclude ingestion incidents where magnets were mentioned but not confirmed? And didn't they exclude unidentified products in calculating that number? Sure, Your Honor, but that still doesn't get to the problem of magnets qua magnets. So sure, they disaggregated costs. I don't understand. What do you mean magnets qua magnets? If they've excluded incidents where they couldn't confirm it's a magnet, then it seems to me that addresses your magnets qua magnets. Respectfully, Your Honor, I don't think it does. I think if someone swallows a single magnet, for example, and that is confirmed on an x-ray or after the magnet passes through the child's enteric system, so it's now confirmed, but the cost associated with taking the child into the ER has nothing to do with the fact that there's a danger from the magnet itself. It's a danger of being a small object. Counsel, didn't the commission calculate when the calculated social costs weigh serious ingestion incidents more heavily? And wouldn't that arise from ingestion of multiple magnets instead of single magnets? Because as I understand it, the risk is much higher and the incident much more serious if at the end of the visit, it turns out it was multiple magnets and the commission's weighing that more heavily in its 51.8 million. Why isn't that reasonable? Is that arbitrary? It's reasonable for me to weigh more heavily. I think it's unreasonable to take into account costs that have nothing to do with magnets, especially high power magnets as such. I see that I'm sort of into my rebuttal time. I'm happy, of course, to keep going, but if the court permits me, I would like to reserve the rest of the time for rebuttal. Thank you, Counsel. Thank you, Judge. Mr. Jed. Good morning, Your Honors. Adam Jed for the United States. And again, thank you very much for the court's indulgence in allowing us to argue remotely given the circumstances and may it please the court. It seems like a number of the questions this morning were focused on this issue of whether the commission's approach here somehow overcounted the potential harms being inflicted by these products by relying on emergency room reports that do not necessarily distinguish between a single magnet ingestion or a multi-magnet ingestion. And as I think a number of the questions got to, the agency ultimately just had to make a number of methodological choices. Those methodological choices yielded a highly conservative estimate. And then with that highly conservative estimate in hand, the agency was well aware of potential noise in that data and then took that into account when it undertook a sensitivity analysis. So if I could just briefly explain each piece of this. First of all, I think that my friend is just misunderstanding the way that the commission created that initial, they called it at times, base case or sort of primary analysis, that initial estimate of harm. There's a specific known hazard that is unique to these products. We know that that known hazard would be less likely to crop up the data in the first place. If for example, you just swallowed a single magnet, it may very well just pass through unnoticed. For example, child doesn't have a stomach ache, no reason to take the child to the doctor in the first place. But more to the point, contrary to what I think may be the premise of my friend's argument generally and my friend's, I guess, newfound reliance in the reply brief on one study that was cited within the preamble, I think that's what he's pointing to for his one third data. This was not just a count of incidents. It wasn't just how many times did a child need to be treated for a magnet ingestion. Rather, it took account of the costs. And so if you look, probably the cleanest place you can find this is in the excerpts of record that we filed, volume three, pages 591 to 592. That's the preamble to the final rule. Obviously, you can find this preamble, but this is a chart that I think assembles all of the data pretty nicely. What you can see is the agency broke down the costs based on the place of treatment. If someone was just treated in a doctor's office, if someone was treated in an emergency room, or then two different categories where a child was admitted to the hospital, either admitted from an emergency room or admitted directly. And if you look at that data, what you can see is that of the $51.8 million estimated harm, 41.7 of that was from hospital admissions. Look, is it theoretically possible that some extremely conservative doctor would decide to admit somebody to the hospital, even if they're showing no symptoms, or even if there's not necessarily a cause for concern? Anything is possible. But as you look at the preamble, what they explain is what's mostly driving this data are incidents where there's a radiological study, they see magnets, they see multiple magnets, there are follow-up radiological studies, endoscopies have to be done, CT scans have to be done, surgical procedures have to be done. That's what's driving the vast majority of these costs. And those sorts of incidents are, even if it might be theoretically possible, extremely unlikely to be driven by the sort of single magnet ingestions that I think my friend is relying on. And I mean, in addition just to looking at the data, recall that obviously the prior rule does serve as a natural experiment. We do see this trend where the number of incidents dropped significantly when the prior rule was announced in effect, and then surges on the prior rules. Mr. Jett, Mr. Jett, could I just jump in? Of course, it is appropriate in calculating costs, social costs, to include ER incidents when it turns out it was just a single as opposed to multiple magnets. Well, Your Honor, look, obviously- Is that, well, is that in the 51.8 or is it not? The 51.8 is just being drawn from those NEISS reports as the agency spells out very clearly. Those often lack kind of detailed specifics of the incident for the obvious- Well, no, no, my specific- Oh, I'm sorry. My specific question is whether single magnet ingestion costs of emergency room visits and treatments are included in the 51.8. They may well be. We don't definitively know because the 51.8 is being generated from those sort of brief emergency room notes where a doctor is, you know, obviously more focused on trying to save a child's life than, you know, kind of documenting every single thing. Do we not know then whether this one-third claim is even accurate? We do not. The one-third claim is being driven from, I believe it was a single study. Again, we're getting this for the first time in the reply brief, but it's being drawn from a single study that is referenced in the preamble. Now, I should point out, even if you did just do a kind of across-the-board one-third discount to the 51.8 million estimate, you would still land right around 35 million, which is the very, very upper bound of the estimated costs of this rule. But more to the point, it's not uniform. In other words, that one-third of cases, even if one-third is the number, and we don't know if it's the number, but even if that is the number, that one-third of cases would be, tend to be, and almost certainly are, the least expensive of the incidents rather than the most expensive of the incidents. So it wouldn't just be some kind of a one-third discount. But more to the point, I think this is where the sensitivity analysis comes in, Your Honor, because any, again, the agency did not. Okay, I'm going to interrupt you again. Of course. Sorry about that, but I need to ask you some questions. Please. So you mentioned a couple of minutes ago pages 591 and 592. Yes, Your Honor. In the appendix. Yes, Your Honor. Okay. It just so happened I have them right in front of me. Terrific. And I had a question. I had a question about those. All right. So it seems like... I'm not going to pull those up as well, but... Good. No, no, I'm sorry. Please, please go ahead. Well, my question is this. On 591, if I'm reading it correctly, there's a discussion on the third column about unidentified products. And at one point, it said that the societal costs for unidentified product ingestion injuries could be as much as $167.9 million. That's correct. So far, so good? Yes. Okay. So here's what I'm not understanding. If you go over to the next page and you look at table eight, which is the table that gets you to 51.8, the heading on it, if you read through it towards the end, says that it includes treatment for injuries for unidentified magnets. So I'm having some trouble reconciling the table with the narrative on the previous page and wondering if that was a mistake on the table. Because am I right that unidentified products weren't factored in to the benefits number? You are correct that they weren't factored into the benefits number. And if you look at the bottom right of that page, 591, which you have in front of you, it says, I'm just quoting, because CPSC does not know precisely how many of these products would fall within the scope of the rule, CPSC conservatively has not included them in the primary benefits analysis summarized above. And that primary benefits analysis summarized above, if you look at it, will then sort of notice that. And so my assumption is that is just some mistake in that header. If the court were interested to know more, I could certainly follow up with the commission and send in a letter if that would be of any assistance. Well, it did catch my eye. So that's why I'm asking you. Yeah, no, absolutely. And look, obviously, Your Honor, that 167.9 figure obviously couldn't be reflected in that table, because the highest possible number on that table is 51.8. But what we do know is that 167.9 figure is just kind of one of the many ways in which the 51.8 estimate was incredibly conservative. I mean, the 51.8 estimate, first, if you look at 2-309, volume 2, page 309, it is only about incidents that clearly involve a magnet ingestion. So if there's a ingestion, or there's a reference to an ingestion, but it's not clear what the object was, or even if you have both words, but it's not certain exactly that something got swallowed, doesn't get counted at all. Then if you look at 3-ER-571 and 591, you get that sort of unidentified product issue, that if they couldn't definitively identify, even within magnet ingestions, the category of product was at issue, then they just didn't count it at all. That's the 167.9 figure that Your Honor referenced. The agency also didn't count. It was approximately $2-4 million attributable to the death of children. So even that 51.8 million base case is just so much larger than the very highest conceivable end of cost, 35 million. That obviously fits into the agency sensitivity analysis. But as the agency explained, the theoretical upper bounds of the benefits of this rule are so significantly higher. Even just adding that 167.9 figure, it gets you up to 209.7. Again, we fully concede that data is not perfect. That is the nature of regulation. You can't definitively know. You rely on the best data that you have, and then you create the best estimates that you can. Then the agency here did so using conservative steps across the board. Every conceivable tie basically went against regulation, and then conducted a sensitivity analysis where even at the highest possible end of the cost of this rule, the benefits still exceeded the costs. Mr. Jed, this is Judge Federico. I just heard Mr. Dolan say a minute ago that the commission did better than it did last time before this court struck down the 2014 rules in magnets. I think I can glean from your brief how it is you would say you did better, but can you give me the tops on that and just tell me what the commission did differently, the bullet points that should lead to this court denying or affirming the rule? Let's go around. Absolutely. I think there were three concerns that this court raised in the prior Zen Magnets decision. This time around, the agency I think not only addressed them, but went out of its way to belt and suspenders, triply address the concerns that this court raised. First, this court flagged the concern that previously the agency, when it counted the potential benefits, were counting incidents that were attributable to unknown products. Here, what the agency did is first, as it made very clear, again, it spelled out in that sensitivity analysis that it was conservatively not including any of those unknown incidents. I should point out the agency did actually conduct an analysis, which would lead to the conclusion that many, if not most, of the unknown incidents are attributable to the subject magnet products. I think even just with that analysis, consistent with Zen Magnets, the agency could have counted maybe with some sort of a discount those incidents, but again, conservatively, the agency did not. Number two, the court in Zen Magnets raised the concern that the agency was relying on data that may have been somewhat stale and was not taking into account changes in the market. Here, although obviously parts of the preamble go back to data from, I think it's 2010, for the purposes of creating these counts, the agency looked at 2017 to 2021, the most recent period, a period of time that postdates vacatur of the prior rule, and then the agency also conducted that trends analysis. Now, that trends analysis, we think, is actually quite corroborative of the agency's other conclusions, but it does also make sure that the agency was not missing changes in the market, that it's not like the problem was somehow disappearing and the agency was just relying on stale data by mistake. And then finally, Your Honor, I think in Zen Magnets, the court expressed concern that potential use for math and science, education, and research was not necessarily being taken into account in the agency's analysis of the cost of the rule, and here the agency did so in two different ways. First, the rule itself carves out products that are sold solely to educators or researchers or sold commercially for educational or research use. You can find that at section 1262.2 of the rule. But second, the agency discussed the effects on education and innovation. Probably the best examples of just that discussion generally are going to be our excerpts of record, pages 585 and 589, and then the agency made very clear that when it was conducting its cost modeling, it was a sort of market-based modeling, that that modeling does then take into account any lost educational or innovative uses, and you can find that discussion at page 593 of the excerpts of record. Unless the court has any other questions. I have one quick question, counsel, just for clarification. One of the arguments that I don't think has been mentioned much here that the appellants make is that the correlation evidence that you had is inaccurate. In particular, I think you studied the magnet ingestions while the, you know, the rule was previously in effect and then after to show the correlation between the two and how the ingestions increased when the rule was no longer in effect. My question is really, you made an interesting argument and said that that, I think that that argument, correlation argument, had been waived. Is that right? We have a number of responses to that argument. One of them is they never presented. I'm just trying to, I just want to get your response to see if that was waived or if we could address it as an obvious problem that's readily apparent from the data itself. I'm sorry, I see my time has expired. If I answer the question that's on the table. Please, please do. Yes, so the petitioners did not present that argument to the agency. It is hardly an obvious argument and indeed the petitioners, I think, are actually relying on extra record evidence to advance that argument even though the judicial review provision says that review of this rule is based on the evidence that is in the Of course, I'm happy to spell this out in more length. But if you look at pages 32 to 36 in our brief, we do explain why it is that they just also misunderstood those trends. They seem to be looking at some trends that they say began in 2018. And so what their misunderstanding is both that the incident numbers dropped when the prior rules announced in effect that the surge began in 2017 before the trends that they point to. And actually, as we point out on page 35 of our brief, if you look at the data that again, they've generated and they're presenting for the first time. I saw your arguments on that point. I just really wanted clarification on whether you thought that this was obvious from the data itself. Understood. And no, we do not think that it was obvious from the data. I mean, you know, obviously, the trends did not form a primary part of the agency's analysis. It was just corroborative and what they're suggesting about Thank you, Your Honor. Thank you. Thank you. Thank you, Mr. Jed. We have some rebuttal time. Thank you, Your Honor. Let me just pick up if I may where my learned co-counsel and opposing counsel and Judge Morris left off. We disagree, of course, that this argument was waived and we do think it was apparent from the data. After all, these trends are not a separate study that Magnet Safety itself or any of our other clients have conducted. We just extracted this data straight from NEI assess report itself, the very report on which the commission relied in terms of the number of ingestions of other small objects versus magnets, et cetera. So, well, but your argument that there's some logical fallacy within the comparison or the correlation, that is, to me, the argument that may not be obvious from the data itself, as explained by the commission. Well, Your Honor, I think the logical fallacy is that it's always a logical fallacy merely to assert that, you know, post hoc ergo proctor hoc and the commission simply said, well, during the 2014 to 2016 years when the rule was in effect, the number of ingestions was lower, and now it's higher. And that very well may be, but the question is always as compared to what. And if you compare it to the rest of the ingestion, that just simply tracks throughout. And the last one that I want to make, if I may, is in terms of counting the benefits of having these magnets out or the cost of the rule. As we explained in our brief, one of the issues is that the commission, although they did make some exceptions for sales of these items to educational institutions, they did undercount the benefits, such as by ignoring the fact that lots of education happens at home, either through homework or homeschooling, and the benefits that kids may have in school by having access to these magnets, kids who are, for example, doing their homework at home or homeschools are being denied them. And, you know, that at least should have been taken into account. With that, unless there's any further questions, we're happy to submit the rest of the briefs. Thank you, counsel. Thanks to both of you for the arguments. I'm pleased we were able to do this today via video. And at least from where we sit, it seemed like it worked pretty well. So thank you to both of you for the arguments. The case will be submitted and counsel are excused.